2013-1442
(Reexamination No. 95/000,415)
-------------------------------------------------------------------
UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT
-------------------------------------------------------------------
PANDUIT CORPORATION,

Appellant,

v.

ADC TELECOMMUNICATIONS, INC.

Appellee.

Appeals from the United States Patent and Trademark Office, Board of Patent Appeals and Interferences.

----------------------------------------------------------------
APPELLEE ADC TELECOMMUNICATIONS, INC.'S
RESPONSE BRIEF
----------------------------------------------------------------

Philip P. Caspers
Timothy A. Lindquist
Samuel A. Hamer
Joseph W. Winkels
CARLSON CASPERS VANDENBURGH
LINDQUIST & SCHUMAN, P.A
225 South Sixth Street, Suite 4200
Minneapolis, Minnesota 55402
Phone: (612) 436-9600

*Attorneys for Appellee*

Dated: October 24, 2013          ADC Telecommunications, Inc.

# CERTIFICATE OF INTEREST

Counsel for Appellee ADC Telecommunications, Inc. certifies the following:

1. The full name of every party or amicus represented by me is:  ADC Telecommunications, Inc.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:  ADC Telecommunications, Inc.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:  ADC Telecommunications, Inc. is a wholly-owned subsidiary of Tyco Electronics Group S.A., and Tyco Electronics Group S.A. is a wholly-owned subsidiary of TE Connectivity Ltd., a publicly traded company.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

CARLSON, CASPERS, VANDENBURGH, LINDQUIST & SCHUMAN, P.A.:
Philip P. Caspers, Timothy A. Lindquist, Samuel A. Hamer, Joseph W. Winkels

MERCHANT & GOULD:  Steven C. Bruess

Dated:  October 24, 2013           /s/ Philip P. Caspers
                                   Philip P. Caspers

i

# <u>TABLE OF CONTENTS</u>

                                                                                  <u>Page</u>

CERTIFICATE OF INTEREST ................................................................................i

TABLE OF CONTENTS.................................................................................... ii

TABLE OF AUTHORITIES ............................................................................iv

STATEMENT OF RELATED CASES ................................................................1

ABBREVIATIONS ............................................................................................2

COUNTER-STATEMENT OF THE ISSUES ........................................................3

COUNTER-STATEMENT OF THE CASE ..........................................................4

COUNTER-STATEMENT OF THE FACTS ..........................................................8

     A.    The Declaration Of David Rapp...........................................................8

     B.    The Context To The '242 Patent ........................................................8

     C.    The Invention – Independent Claims 13 And 26 ................................11

     D.    The Benefits Of The Invention............................................................13

SUMMARY OF ARGUMENT .........................................................................16

ARGUMENT ..................................................................................................18

STANDARD OF REVIEW ................................................................................18

I.     THE BOARD'S CONSTRUCTION OF "TROUGH" IN "CABLE EXIT
     TROUGH" WAS NOT IN ERROR ............................................................20

II.    THE BOARD DID NOT ERR IN REFUSING TO REJECT CLAIMS
     26-28 AND 31-32 AS ANTICIPATED BY ZETENA .................................31

     A.    Zetena's Strain Reliever Does Not Include A Cable Exit Trough......31

     B.    Panduit's Arguments Regarding The "Upper Portion" Are Moot......35

III. THE BOARD DID NOT ERR IN REFUSING TO REJECT CLAIMS 6-8, 11-16, 18, 26-28 and 31-35 AS ANTICIPATED BY LONG ...................36

    A. Long Does Not Disclose An Exit Trough ...........................................36

    B. Long Does Not Disclose An Upper Surface That "Defines A Top Boundary Of At Least A Portion Of A Cable Path" As Recited In Claims 13-18 And 35, Or That "Defines An Upper Surface Of A Cable Path" As Recited In Claims 33-34 ....................42

        1. Panduit did not challenge the Board's finding that Long lacks this feature.......................................................................42

        2. The Examiner and the Board correctly found that Long does not disclose an upper surface as defined in the claims. ......................................................................................47

CONCLUSION .......................................................................................................51

# TABLE OF AUTHORITIES

**Cases**

*Consol. Edison Co. v. NLRB,*
  305 U.S. 197 (1938)...........................................................................19

*In re Baxter Travenol Labs.,*
  952 F.2d 388 (Fed. Cir. 1991) ..........................................................18

*In re Gartside,*
  203 F.3d 1305 (Fed. Cir. 2000) ........................................................18

*In re Jolley,*
  308 F.3d 1317  (Fed. Cir. 2002) ........................................................19

*In re Kotzab,*
  217 F.3d 1365 (Fed. Cir. 2000) ........................................................19

*In re NTP, Inc.,*
  654 F.3d 1268 (Fed. Cir. 2011) ........................................................18

*On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH,*
  386 F.3d 1133 (Fed. Cir. 2004) ........................................................23

*Para-Ordnance Mfg.* v. *SGS Imps. Int'l,*
  73 F.3d 1085 (Fed. Cir. 1995) ..........................................................18

*Steven v. Tamai,*
  366 F.3d 1325 (Fed. Cir. 2004) ........................................................18

**Statutes**

35 U.S.C. §102(b) ........................................................................ 16, 17

## <u>STATEMENT OF RELATED CASES</u>

The patent at issue in this appeal is related to three other patents that are in *inter partes* reexamination. Two of these related *inter partes* reexaminations were the subject of prior appeals and cross appeals to this Court. *See* Appeal Nos. 2012-1435-1436 (Reexamination No. 95/000,412) (regarding U.S. Patent No. 6,868,220) and Appeal Nos. 2012-1437-1438 (Reexamination 95/000,413) (regarding U.S. Patent No. 7,167,625). On August 12, 2013, this Court summarily affirmed the judgment pursuant to Fed. Cir. R. 26 in both of these prior appeals.

The third related *inter partes* reexamination is currently on appeal to this Court. *See* Appeal No. 2013-1501-1502 (Reexamination 95/000,411)(regarding U.S. Patent No. 6,597,854).

The patent that is at issue in this appeal, as well as the other three above-mentioned patents, are the subject of a patent infringement action pending in the United States District Court for the District of Minnesota, *ADC Telecommunications, Inc. v. Panduit Corp.*, Civil Action No. 07-cv-04452 (DWF/SER). The Minnesota action has been stayed pending the outcome of this reexamination and the other above-mentioned reexaminations.

## ABBREVIATIONS

| PARTIES | |
|---|---|
| Panduit | Appellant Panduit Corporation |
| ADC | Appellee ADC Telecommunications, Inc. |
| | |
| **PATENTS** | |
| the '242 patent | U.S. Patent No. 6,925,242  (A102-A122) |
| Long | U.S. Patent No. 5,872,336  (A790-A794) |
| Zetena | U.S. Patent No. 5,271,585  (A795-A804) |

## COUNTER-STATEMENT OF THE ISSUES

I. Whether the Board was correct in affirming the Examiner's refusal to adopt the proposed § 102 rejection of claims 26-28, 31 and 32 based on Zetena?

II. Whether the Board was correct in affirming the Examiner's refusal to adopt the proposed § 102 rejection of claims 6-8, 11-16, 18, 26-28 and 31-35 based on Long?

## <u>COUNTER-STATEMENT OF THE CASE</u>

This appeal involves an *inter partes* reexamination of the '242 patent.

On November 6, 2008, Panduit filed a request for *inter partes* reexamination of the '242 patent which included claims 1-18. The request sought reexamination of all eighteen claims and proposed multiple rejections. One of Panduit's proposed rejections was that claims 6-8, 11-16 and 18 are invalid under 35 U.S.C. § 102 based on Long.

On January 12, 2009, the Patent Office granted the reexamination request and issued an Office Action. In the Office Action, the Examiner refused to adopt most of Panduit's proposed rejections, including Panduit's proposed § 102 rejection based on Long. A730. However, the Examiner rejected certain claims based on other grounds that Panduit had proposed. A732-33.

On March 12, 2009, ADC filed an Amendment and Response. ADC amended certain claims, and added seven new dependent claims (i.e., claims 19-25). A704-A708. Panduit filed a Reply, responding to the Examiner's refusal to adopt certain of Panduit's proposed rejections, and arguing that ADC's amendments to the existing claims did not overcome the Examiner's adopted rejections. A680-A702.

The Examiner issued an Action Closing Prosecution ("ACP"). In the ACP, the Examiner withdrew some of the original rejections, maintained other rejections

4

from the Office Action, and again refused to adopt any of Panduit's other proposed rejections, including Panduit's proposed rejection based on Long. A666. Following the ACP, claims 1-5 were allowed and claims 6-25 stood rejected. A663.

The Examiner subsequently issued a Right of Appeal Notice ("RAN") which adopted all the findings from the ACP. A649-A660.

Each of the parties appealed the Examiner's decision to the Board. ADC appealed the Examiner's adoption of certain rejections, and Panduit appealed the Examiner's refusal to adopt some of its proposed rejections.

On June 22, 2011, the Board issued its Decision on Appeal. A41-A92. The Board reversed some of the rejections that the Examiner had made, and affirmed other rejections. In addition, the Board issued new grounds of rejection for some claims that had not been made by the Examiner. The Board also affirmed the Examiner's decision not to adopt Panduit's proposed § 102 rejection of claims 6-8, 11-16 and 18 based on Long. A78-79. Following the Board's decision, claims 2, 19 and 22 were allowed and the remaining claims stood rejected.

ADC subsequently reopened prosecution to address the new grounds of rejection that the Board had made in its June 22, 2011 decision. In reopened prosecution, ADC filed an amendment that amended claims 13-18 and added new claims 26-35. A233-A236. Claim 26 is an independent claim from which new

claims 27-34 depend, and new claim 35 depends from independent claim 13. New claim 26 is the same as independent claim 6 but with further narrowing limitations to address the new grounds of rejection that the Board had made for claim 6. ADC added new claim 26 (as opposed to just amending independent claim 6) in order to avoid narrowing claims depending from claim 6 that had been allowed by the Board (e.g., claims 19 and 22).

Panduit submitted comments in response to ADC's amendment. Panduit did not dispute that ADC's amended and new claims overcame the Board's new grounds of rejection. Instead, Panduit proposed three new rejections (listed below), each based at least in part on a new reference (Zetena) that had not been raised previously during the reexamination:

1. Claims 26-28 and 31-32 are invalid under § 102 based on Zetena;

2. Claims 13-16, 18, 33 and 34 are obvious over Zetena in view of Long;

3. Claim 17 is obvious over Zetena and Long in view of Scheuermann.

In addition to these newly-proposed rejections, Panduit reargued the proposed § 102 rejection based on Long that the Examiner and the Board had already refused to adopt, and submitted new evidence (e.g, dictionary definitions and a declaration) to support its re-argument of this proposed rejection. A215-A216. In particular, Panduit argued that amended claims 13-18 and new claims 26-28 and 31-35 are anticipated by Long even though the Board had already found that independent

6

claim 13 (prior to ADC's narrowing amendment) and claim 6 (which is recited verbatim in new claim 26 along with further narrowing amendments) are patentable over Long.

On October 14, 2011, the Examiner issued a determination finding that ADC's amended and new claims are patentable, including a finding that the amended claims 13-18 and 26-35 are patentable over Panduit's new proposed rejections based on Zetena. A196. Further, the Examiner found that Panduit's re-argument of the proposed § 102 rejection based on Long was improper because it did not relate to the new grounds of rejection or to ADC's amendments, and that the Board had already decided in its prior decision not to adopt the proposed Long rejection. A196-A197. Therefore, the Examiner refused to enter into the record or consider Panduit's new evidence (the dictionary definitions and declaration). A197.

Panduit challenged the Examiner's determination to the Board. On June 8, 2012, the Board issued a decision affirming the Examiner's determination. A18-A40.

On February 27, 2013, the Board issued a decision on rehearing denying Panduit's request to modify its previous decisions. A1-A17.

7

## COUNTER-STATEMENT OF THE FACTS

### A.    The Declaration of David Rapp

ADC invites the Court to review the Declaration of David Rapp, who provides an uncontroverted and detailed review of the context to the invention, the invention, and the benefits of the invention.  A251-A255.

Mr. Rapp's background qualifies him as a person of skill in the pertinent art. He has hands on experience with the invention of the '242 patent, which he refers to as the Express Exit or Express Exit trough.  Mr. Rapp, a former ADC employee, has 13 years experience with products for routing and connecting fibers.  That experience includes hands-on experience designing and developing fiber routing systems, and managing ADC's fiber routing product line that includes the Express Exit trough.  Mr. Rapp is also the named inventor on more than 25 patents relating to cabling systems.

### B.    The Context to the '242 Patent

The '242 patent discloses a cable exit trough that routes optical fiber cables out of a lateral trough and downward (toward the floor) to telecommunication equipment.  *See* A120 (col. 2:51-59); A251(¶ 5).  Fiber routing systems guide and protect fiber cables between telecommunications equipment.  *Id.*  Such systems are typically installed in ceiling areas above equipment racks.  *See, e.g.*, A120 (col. 1, lines 25-47); A251(¶ 5).  In a typical installation, long, straight trough sections run horizontally (i.e., referred to as lateral troughs, *see* A251(¶ 5)) near the ceiling

8

above equipment racks, and optical fiber cables may be routed from equipment on a first rack, up to the lateral trough sections near the ceiling, into and then horizontally through the lateral trough sections until they reach a point above a second equipment rack, and then out of the lateral trough and down to the desired equipment. As explained by Mr. Rapp, the invention of the Express Exit trough relates to transitioning fiber cables out of the lateral trough sections.

As further context leading to the '242 invention, Mr. Rapp discusses some of the design drivers and constraints facing those designing products to transition fiber cables out of lateral trough sections. Mr. Rapp explains that one of the most fundamental design drivers for this art relates to the bending of the fibers. Because bending of the fibers can result in a degraded or blocked signal, bending of the cable should be avoided where possible. A252 (¶6).[1]

Prior to the present invention, cable exit systems for troughs relied on defining a path through the sidewall of the lateral trough. This required cutting the sidewall and inserting fittings to transition the fibers through the sidewall. One

---

[1] In paragraph 7 of his declaration, Mr. Rapp also explains that routing systems must also factor in the limited clearance between the lateral troughs and the ceiling (where they are typically suspended from) when designing routing system components. A252. In horizontal systems like the one disclosed in the '242 patent, vertical space above the horizontal troughs is very limited. *Id*. Also, in paragraph 8, Mr. Rapp explains that long runs of fiber cable from the ceiling down to equipment, by force of gravity, can result in relatively heavy loads or pressure on the cables and sides of the lateral trough at the point where the cable transitions from horizontal to vertical. *Id*.

example is disclosed in Fig. 8 of U.S. Patent No. 5,067,678, filed in 1989 and

incorporated by reference into the '242 patent, which describes a fitting for

transitioning cables downward out of the lateral troughs.  A3056 (FIG. 8); A3078

(col. 6:36-49); A120 (col. 2:64-66).  The system required cutting out a portion of

the straight trough and replacing it with the downspout fitting.  The downspout

fitting defined a hole through the side and/or bottom wall of the fitting to allow

cables to exit the lateral trough.  Another prior approach was to cut a slot into a

sidewall of the straight trough section and place a fitting into the slot to route the

fiber through the sidewall.  *See* A3089 ("Drop-off connector…provides a safe exit

for fibres down to equipment below.  It fits snugly into a cut out using Cut Out

Tool…"); A3094 (element G).  These two known approaches are illustrated below:



A253.

By defining a path through the sidewall of the lateral trough, these cable exit systems created a direct path to the destination equipment, and therefore minimized bending of the optical fiber cables. Such cable exit systems did not require additional space above the cable routing system in the ceiling area above the equipment racks.

## C. The Invention – Independent Claims 13 and 26

The inventors of the '242 patent went against the teaching of previous cable exit systems which routed the cables through the sidewall. By contrast, the '242 patent inventors developed a cable exit trough system (shown below), that initially directs the optical fiber cables in an upward direction (i.e., in a direction that is the opposite of the end destination below the lateral trough). This indirect-path approach required more bending of the fiber cables. It also required that space above the cable exit system be used. Mr. Rapp explains in further detail that the invention of the Express Exit troughs was counterintuitive, stating:

> 11. Given the context of the invention that I discuss in paragraphs 6-8 above related to designing horizontal fiber routing systems located near the ceiling, the invention of the Express Exits was counterintuitive for multiple reasons. First, these new Express Exits introduced more bending of the cable, not less. These new exit troughs required the cable to bend upward first—which is the exact opposite direction from the ultimate intended downward direction— and then bend through an additional 180-degrees. This meant that the cable bend would need multiple additional surfaces for managing the fiber bend to prevent damage to the cable. Second, the exit troughs

11

were mounted to define a path over the side wall of the horizontal trough, resulting in additional vertical structure located higher than the horizontal trough. Third, by introducing more bending and thus more cable managing surfaces that carry the cables laterally away from the horizontal trough before dropping downward, supporting the weight of the cables becomes more complicated. In short, the invention of the Express Exits was counterintuitive.

A253 (¶11).

The '242 patent includes four independent claims, 1, 6, 13 and 26. Claims 1 and 6 stand rejected, and ADC has not appealed those rejections.[2] Claim 13 is directed to a cable exit system with a cable exit trough mounted to a lateral trough. A233. Claim 26 is directed to a method of routing a cable in a cable routing system that includes a cable exit trough mountable to a lateral trough section. A234-A235.

Consistent with the embodiment illustrated below, both claims 13 and 26 recite a "cable exit trough" that provides an exit pathway for routing cables over the sidewall of the trough. Claim 13 further requires that the exit trough include "an upper surface" that "curves upward relative to the base of the lateral trough section and defines a top boundary of at least a portion of a cable path." A233. An example of such an upper surface is identified in the embodiment below.

---

[2] Panduit's appeal includes an appeal of the Board's failure to adopt a rejection of claim 6. However, that issue is moot because claim 6 otherwise stands rejected, and ADC has not appealed that issue.



base of lateral trough section

upper surface curving upward relative to base and defining top boundary of cable path

A104. By positioning such a guiding surface above the path of the cable, the

surface helps to prevent cables from slipping up out of the exit trough.

### D.     The Benefits of the Invention

Despite violating the design drivers discussed in the Rapp Declaration, the

exit trough invention of the '242 patent proved to be very successful. Mr. Rapp

explains:

> Despite the reasons discussed above, for example, in paragraph 11[of my
> Declaration] that suggested that the invention of the Express Exit troughs
> would not be desired by customers, the exact opposite has proved to be true.
> These devices have enjoyed great commercial success. The ADC Express
> Exit troughs have become critical to successful marketing of ADC's cable
> routing system. The benefit of quick installation, without the need to cut
> slots, and the ability to reposition the exit troughs without leaving a hole or
> slot in the horizontal trough, motivate customers to insist that routing
> systems include these type of components before committing to a
> manufacturer's routing system. . . .

A254 (¶15).

By using the space above the lateral trough and avoiding cutting the lateral trough sidewall, the '242 inventors created a new exit trough system that is not destructive of the lateral trough. No mounting structure is inserted through cut-outs or holes through the sidewall, thus minimizing risk of damage to the fibers in the trough. The disclosed exit trough routes the fiber cables first upwardly (in the opposite direction from the end destination) and then over the top of the lateral trough sidewall, not through it. The exit trough includes a combination of curved surfaces for safely transitioning the cables over the top of the lateral trough sidewall. An example of such a surface is the upper surface, recited, e.g., in claim 13, that helps to prevent cables from slipping up out of the exit trough.

The new cable exit trough is much easier to install, for example, when new equipment is added, and much easier to reposition, for example, when equipment is moved. And, in both cases, the '242 exit trough system reduces the risk of damage to the optical fiber cables that may already be present in the lateral trough when the exit trough is installed.

Panduit is free to practice any of the prior art devices it has asserted in this reexamination. This includes the funnel-shaped device of Long, which the Board found does not disclose an exit trough, a finding that the Federal Circuit affirmed in a related appeal. This also includes the Zetena device which discloses slots

  
through a thin, flat piece of metal that grip a single cable surrounded by a grommet, which the Board also found is not an exit trough, and therefore does not anticipate the claimed invention.

Tellingly, Panduit has not done so, but rather has deployed and continues to deploy exit *troughs* consistent with the Board's definition and the embodiments disclosed in the '242 patent.[3]

---

[3] Although not of record in this appeal, ADC invites this Court to review Panduit's product on-line at:
http://www.panduit.com/heiler/PartDrawings/FRSPJ4X4_00.pdf, and
http://www.panduit.com/heiler/InstallInstructions/RW251_00.pdf; and
U.S. Patent No. 8,315,069 (assigned to Panduit). Note that the Panduit devices look nothing like the tube-like Long device or the slotted Zetena device. Instead, Panduit's products include an exit *trough* as described in the '242 patent.

## SUMMARY OF ARGUMENT

The Board properly and consistently construed the term *trough* to be a long, narrow open receptacle, gutter or channel. That construction is consistent with the plain, ordinary meaning of the word as well as the disclosure in the '242 patent.

Panduit's proposed interpretation of *cable exit trough* ("a structure that routes cables out of a lateral trough section by providing a pathway for the cables to exit the lateral trough section") is unreasonable because it effectively writes the word *trough* out of the claim by defining it to mean any generic structure that routes cables. In doing so, Panduit's proposed definition of *trough* encompasses arrangements that clearly do not have a trough configuration, including enclosed tubes, convex surfaces without any sides, and slots that are cut into a thin piece of metal. Moreover, Panduit's interpretation conflicts with the '242 patent in which every disclosed trough is open and includes multiple surfaces (e.g., bottom and sides) that form a channel for routing cables.

The Board properly refused to adopt Panduit's proposed rejection of claims 26-28, 31 and 32 under 35 U.S.C. § 102(b) based on Zetena. The single downwardly-curved surface on the Zetena strain reliever 54 is not a *trough* under any reasonable interpretation of that word. Similarly, the slots in the holder 56 on the strain reliever do not form a trough because they are simply holes cut into a thin piece of metal. The Board also found that Zetena lacks the recited *upper*

16

*portion* recited in these claims.  However, given that Zetena plainly fails to disclose a trough, the Board's alternative basis for refusing to adopt this rejection (that Zetena lacks the recited upper portion) is moot.

The Board also properly refused to adopt Panduit's proposed rejection of claims 6-8, 11-16, 18, 26-28 and 31-35 under 35 U.S.C. § 102(b) based on Long. The Examiner and the Board properly found that Long does not disclose a cable exit *trough* which is recited in each of these claims.  As the Board correctly found, there is no evidence whatsoever that the funnel-shaped part 5 either alone or in combination with other features disclosed in Long provides an open channel or receptacle for routing cables out of a lateral trough.  Moreover, as the Board also correctly found Long does not disclose an *upper surface* that *defines a top boundary of a cable path* as further recited in claims 13-16, 18 and 33-34.  Panduit did not identify to the Examiner or to the Board any such disclosure in Long, and Panduit has not even addressed this missing claim element in its principal brief to this Court despite the finding below that it is absent in Long.

**ARGUMENT**

**STANDARD OF REVIEW**

This Court reviews the Board's legal conclusions *de novo*. *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000). Such legal conclusions include issues of claim construction and statutory interpretation. *In re NTP, Inc.*, 654 F.3d 1268, 1274 (Fed. Cir. 2011) (citation omitted); *Steven v. Tamai*, 366 F.3d 1325, 1330 (Fed. Cir. 2004). Board factual findings are reviewed for substantial evidence. *In re Gartside*, 203 F.3d at 1316.

Anticipation is a question of fact. *In re Baxter Travenol Labs.*, 952 F.2d 388, 390 (Fed. Cir. 1991). What a reference teaches is a question of fact. *Para-Ordnance Mfg.* v. *SGS Imps. Int'l*, 73 F.3d 1085, 1088 (Fed. Cir. 1995). Thus, the Board's fact findings on what Zetena and Long teach and whether either of those references anticipates the claims must be affirmed if they are supported by substantial evidence. *See In re Gartside*, 203 F.3d 1305, 1315-16 (Fed. Cir. 2000) (holding that substantial evidence is the appropriate standard of review for the Board's findings of fact); *Para-Ordnance Mfg.*, 73 F.3d at 1088 ("What the prior art teaches and whether it teaches toward or away from the claimed invention also is a determination of fact.").

Substantial evidence "is something less than the weight of the evidence but more than a mere scintilla of evidence." *In re Kotzab,* 217 F.3d 1365, 1369 (Fed.

Cir. 2000).  This means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938).  Further, if "the evidence in [the] record will support several reasonable but contradictory conclusions," then this Court "will not find the Board's decision unsupported by substantial evidence simply because the Board chose one conclusion over another plausible alternative."  *In re Jolley,* 308 F.3d 1317, 1320 (Fed. Cir. 2002).

# I.
## THE BOARD'S CONSTRUCTION OF "TROUGH" IN "CABLE EXIT TROUGH" WAS NOT IN ERROR

The Board consistently construed the term *trough* to mean a long, narrow open receptacle, gutter or channel. A6, A50, A78. The Board's construction was informed by the specification's disclosure of cable exit trough 100 in FIG. 1 (A104) and by a common dictionary definition for the term *trough*.

> **trough,** *n.* **1**. a long, narrow, open receptacle, usually boxlike in shape, used chiefly to hold water or food for animals. **2**. a channel or gutter. **3**. any long depression or hollow, as between two ridges or waves. **4**. *Meteorol.* an elongated area of relatively low pressure.

A101, A50, A14.

Panduit complains that the Board's definition is too narrow. Before the Board, Panduit asserted that a *trough* means "nothing more than a structure that holds and routes cables." *See* A6. Likewise, Panduit now asks this Court to construe "cable exit trough" to mean "a structure that routes cables out of a lateral trough section by providing a pathway for the cables to exit the lateral trough section."

The goal of Panduit's proposed constructions is to erase the word "trough" from the claim. Panduit's construction gives no specific meaning to the term *trough* and, instead, suggests that the term *trough* means any structure, regardless of its shape or configuration. It is important to recognize, however, that the claim is directed to a cable exit *trough*, not a cable exit *structure* or a cable exit *device*.

In the English language, a trough is understood to refer to a structure with a specific shape and configuration, not just any structure. The Board's construction appropriately recognizes the commonly understood configuration and shape denoted by the term *trough*, i.e., a long, narrow open receptacle, gutter or channel.

The only evidence of record cited by Panduit to support its interpretation is the specification of the '242 patent itself.[4]  *See* Panduit Brief at 43. However, nowhere in the specification is the term *trough* or *cable exit trough* defined as broadly as Panduit suggests. The passages quoted by Panduit merely identify how the cable exit trough is *used* in the disclosed embodiment. They do not purport to define the term *trough*. The specification's disclosure that the cable exit trough "creates a cable exit pathway" or "is mountable to the lateral trough section to provide a cable exit pathway from the lateral trough section. . ." does not define what a trough *is*. These passages merely identify how the trough is *used* in this application. A use is not the same as a definition. By analogy, that glue may be used to secure two boards together does not mean that screws are glue. Here, statements in the specification describing how the cable trough is used do not amount to a definition for the term *trough*.

---

[4] Panduit cites a number of dictionary definitions that are not in the record, were not considered by the Examiner or the Board, and, in fact, were specifically excluded from consideration by the Examiner and the Board because they were not timely submitted by Panduit. *See* footnotes 5-6, *infra*. Nevertheless, these are addressed below.

Pulling the word "pathway" from these two portions in the specification, Panduit asserts that the term *trough* means any structure that defines a pathway. This obviously goes too far. Many structures define pathways that are not troughs. A sidewalk defines a pathway but is not a trough. A flight of stairs may define a pathway but is not a trough.

Panduit argues that a trough does not require an open side. In other words, according to Panduit, enclosed tubes or pipe structures are also troughs. There is no evidence in the record that anyone of skill in the art ever has or ever would refer to an enclosed tube or pipe structure as a cable trough. Panduit purports to have found a technical dictionary definition that defines "cable trough" to mean "an enclosed channel, usually beneath the floor, that provides a path for cables." There are multiple problems with Panduit's argument. First, this evidence was not properly submitted to the Examiner. Panduit failed to properly produce this evidence during the original reexamination proceedings and, therefore, neither the Examiner nor the Board considered it. In fact, both the Examiner and the Board expressly refused to enter or consider it because it was submitted improperly. A196-197,[5] A35-38.[6]

---

[5] Examiner's Action, dated 10/14/2011, p 14 ("For these reasons, the third party requester's comments relating to the proposed rejection of claims 13-18, 26-28 and 31-35 under 35 USC 102(e) as anticipated by Long are improper and will not be considered by the examiner in this determination. Since the new evidence (the Rule 132 declaration of Robert Nicoli, the definition of 'cable trough' found in the

Second, the dictionary definition that Panduit provides, which says a cable trough is an "enclosed" channel, if it truly refers to tube-like structures, contradicts and would exclude the preferred embodiment disclosed in the '242 patent. The embodiment shown in FIG. 1 of the '242 patent specification shows exit trough 100 having an open top so that cables can be easily placed in the trough. It is not enclosed. An interpretation that would exclude the preferred embodiment is rarely, if ever, correct. *On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1138 (Fed. Cir. 2004). Likewise, it was reasonable for the Board to give little or no weight to purported claim construction evidence that would contradict or exclude the preferred embodiment of the patent disclosure. The Board properly noted that Panduit's cited definition that cable exit troughs are "enclosed" would exclude the preferred embodiment and, therefore, rejected Panduit's argument. A14.

Third, a cable trough that has an open top side may be used in conjunction with a removable lid or cover. A254 (¶13). It is not clear from the dictionary

McGraw-Hill Dictionary of Scientific and Technical Terms, Fifth Edition, and the definition of 'lying' found in the Random House Webster's Unabridged Dictionary) submitted by the third party requester pertains solely to the improper comments, this new evidence has not been entered and has not been considered by the examiner in this determination.")(A197).

[6] Board Decision, dated 6/8/2012, p.19-20 ("As the Examiner did not consider Panduit's comments and new evidence on the Long rejection, it is not before us upon review because the Examiner's action does not involve the merits of the rejection and is thus not under our jurisdiction to review.") (A38).

definition belatedly cited by Panduit whether the cable troughs being referred to are merely troughs exactly as the Board would define them (with an open side) that have been enclosed by lids or whether they are permanently tubes having no opening along their lengths (as Panduit would have this Court believe). In other words, we do not know from Panduit's purported definition, if the devices being described are characterized as "enclosed" because they are actually u-shaped channels that have lids (which would satisfy the Board's definition requiring an open side) or because they are permanently enclosed.[7] Because Panduit attempted to offer this evidence at a point in the proceedings when the patent owner would have no opportunity to respond with rebuttal evidence to clarify the issue, the Board and this Court are left in the dark, which only underscores why Panduit's submission was procedurally improper.

In fact, the uncontroverted testimony in the record establishes that it is very important to customers that cable troughs be used in combination with trough covers or lids to protect the fibers and that most customers insist on having covers for their cable troughs. A254 (¶ 13). This would explain why the dictionary

---

[7] Notably, in Panduit's definition the phrase "an enclosed channel" is followed by "usually beneath the floor" which may also explain why the definition says "enclosed," i.e., because the channel is covered or enclosed by a floor or wall. Any definition, however, that requires the trough to be enclosed by a wall or floor would contradict and exclude the preferred embodiment disclosed in the '242 patent. In the specification, the trough is not described as enclosed within a floor or wall, but instead is described as being typically "suspended from a ceiling structure." A120 (col. 2:57-59).

definition Panduit tardily cites refers to enclosed channels, but it does not establish whether or not the troughs referred to are pipe or tube structures as opposed to true troughs (having open top sides) combined with removable lids.

Further, the use of the word "channel" in Panduit's definition ("an enclosed channel") itself suggests that a cable trough does have an opening along its length. But Panduit attempts to define away any specific structural meaning to the word *channel* by suggesting that "a channel is simply a course, or a route, i.e. a pathway." Panduit Brief at 46. Notice how far removed from the term *trough* Panduit must go to arrive at *pathway* for its interpretation. First it ignores all the other language in the definition for *trough* which describes a specific shape such as "a long, narrow, open receptacle, channel or gutter." Then it ignores the fact that the word channel when referring to physical structures also denotes a similar shape, i.e., "a groove or furrow" or "a furrow with upstanding sides." Instead, Panduit selectively chooses a more abstract definition for channel as meaning a "course or route." Finally, Panduit throws out "course or route" and substitutes the word *pathway* in its place. This is the strained logic that gets Panduit from *trough* to *pathway*.

The Board's interpretation of *trough* has not been inconsistent or confused. The Board has issued three decisions in this reexamination.[8]  In the first Board decision ("Decision 1"), when considering the phrase "lateral trough section" the Board construed the term *trough* to mean a long, narrow, open receptacle, gutter or channel.  A50.  In the same decision, when discussing its conclusion that the Long reference did not disclose a *cable exit trough*, the Board again reiterated that "a trough is a long, narrow open receptacle."  A78.

The Board in Decision 3, responding to Panduit's request for rehearing, again reiterated and applied the same claim construction, stating:

> We do not agree that the term "trough" means "nothing more than a structure that holds and routes cables."  Id.  "Trough" has a specific meaning with a defined structure which we described in the original Decision 1 as follows: "Consistent with the definition in a general purpose dictionary, we interpret '…trough section' to mean a 'long, narrow, open receptacle,' gutter, or channel [footnote omitted]…."  Decision 1, p. 9.  The cable exit trough 100 shown in Figure 1 of the '242 patent fits this definition because it is long and narrow, which we characterized in Decision 2 as having "substantial length."  Figure 1 of the '242 patent, contrary to Panduit's contention, is clearly a trough as that term would be understood by one of ordinary skill in the art. . . .
>
> Figure 1 shows cable trough 100 mounted on the lateral trough. The trough 100 is more than just a "slot" cut into a strain reliever as described in Zetena.

---

[8] Decision 1 issued as "Decision on Appeal" dated June 22, 2011. A41-A101.  On June 8, 2012, after reopened prosecution was completed, the Board issued its second decision titled, "Decision on Examiner's Determination Under 37 C.F.R. § 41.77(d)." ("Decision 2"). A18-A40.  Finally, on February 27, 2013, the Board issued a third decision titled, "Decision on Rehearing." ("Decision 3")  A1-A17.

For the foregoing reasons, we decline to modify our Decision 2 based on an improper interpretation of "trough."

A6-A7.

Panduit suggests that the Board adopted a different claim construction in Decision 2. Panduit Brief at 42, 49-50. That is not the case. The Board in Decision 2 expressly incorporated Decision 1. A19 (". . .this decision herein incorporates the Decision in Appeal 2011-003297, mailed on June 22, 2011."). The Board's analysis in Decision 2 is completely consistent with the claim construction it adopted from Decision 1. For example, in Decision 2, when discussing the Zetena 102 rejection, the Board stated:

> Cable exit trough
>   Panduit contends that Zetena's cable holder 56 is a "cable exit trough." We do not agree. Cable holder 56 comprises a "slot" 57, not a "trough." A trough has a more substantial length than the slot 57 depicted by Zetena. Because Zetena does not describe a cable exit trough, the Examiner properly did not adopt the anticipation rejection by Zetena.

A26. The Board's discussion of the Zetena reference is completely consistent with the claim construction it adopted in Decision 1. According to the Board, the slot shown in Zetena's device did not amount to a cable exit trough because it did not have substantial length. This follows logically from the Board's construction of trough as, *inter alia*, a *long*, narrow, open receptacle. Therefore, the Board's construction as adopted from Decision 1 supported the Board's reasoning in Decision 2. The Board did not depart from its first claim construction.

Later in Decision 2, the Board addressed a proposed rejection that is not at issue in this appeal. The proposed rejection was a 103 combination of Zetena and the Long reference. In its analysis of this proposed rejection the Board did not adopt any different claim construction. The Board merely noted that even though there was a dispute between the parties as to the meaning of the term "trough," the Board found that even under Panduit's own proposed claim construction there would be no cable exit trough in either Long or Zetena. The Board stated:

> Cable exit trough is not taught by the combination of Zetena and Long
>
> There is some dispute in this proceeding about the meaning of the term trough. However, each of the proposed definitions defines the trough to be a channel (Third Party Requester's Comments on Patentee's Response to Requesting Reopening Prosecution, September 22, 2011, p. 13). A channel would be understood to be a furrow with upstanding sides. Thus, a cable exit trough would be reasonably interpreted by one of skill in the art to require a trough-like structure, i.e., a channel with upstanding sides. In the rejection of claims 13-16, 18, 33, and 34, Panduit did not provide a reason as to why upstanding sides would result or otherwise be obvious from the combination of Zetena and Long.

A34. By pointing to Panduit's own use of the term "channel" in construing the term *trough*, the Board was not adopting a different claim construction. It was merely entertaining for argument's sake, Panduit's own construction to point out that even using Panduit's own words for *trough*, the references do not disclose a cable exit trough.

As pointed out above, in Decision 3, the third and final decision, the Board once again makes clear that it never adopted any different claim construction for *trough*, other than the one it initially asserted in Decision 1.  A6.  Further, the Board addressed Panduit's complaints about the Board's claim construction of *trough*, stating:

> Panduit contends our interpretation of "trough" is not proper, and provided an alternative definition that defines a "cable trough" as an "<u>enclosed</u> channel, usually beneath a floor, that provides a path for cables."  (Requester's Comments on Patent Owner's Response, p. 12-13.)  This argument is not persuasive.  Panduit's definition would exclude the cable trough 100 shown in Figure 1 which is open on the top and not enclosed on four sides.  It is rare to interpret a claim term to exclude preferred embodiments. [citation omitted.]
>
> Moreover, Panduit has not introduced evidence that a cable trough would be reasonably interpreted to include both enclosed and unclosed structures.

A14.  The Board's claim construction is clear and has not changed.  That the Board chose for the sake of argument to point out that even under Panduit's choice of wording, they would not find a cable exit trough in the cited references, does not amount to adopting a second, different claim construction.

At page 45-46 of Panduit's brief, Panduit argues that the claims separately recite upstanding sides.  According to Panduit, this evidences ADC's intent that the term "trough" does not, by itself, necessitate upstanding sides.  This argument has no merit.  In each claim cited by Panduit, the upstanding sides were separately recited because the claims later added limitations relating to or referencing the

upstanding sides of the trough. In other words, the upstanding sides were not recited separately from the trough, except to provide antecedent basis for adding limitations regarding the sides of the trough. For example, claim 13 specifically recites that the lateral trough section has an upstanding side, to provide antecedent basis for another limitation relating to the side, e.g., that the upstanding side has a "uniform cross section . . . ." Likewise, claim 26 recites that the lateral trough section has an "upstanding side" to provide antecedent basis for subsequent limitations, e.g., that the upstanding side is "of substantially uniform height," that the lower portion of the exit trough is releasably mounted "to a top edge of the upstanding side," and that the mounting occurs "without cutting the top edge or the upstanding side." Proper claim drafting, which requires antecedent basis for recited claim elements, forced the patentee to separately recite the upstanding sides of the lateral trough section, not any desire to suggest that a trough need not have sides. Similarly, claim 17 recites that the exit trough includes sidewalls in order to incorporate a limitation that the sidewalls are "curved," not to suggest that the cable exit trough need not have sidewalls.

## II.
## THE BOARD DID NOT ERR IN REFUSING TO REJECT CLAIMS 26-28 AND 31-32 AS ANTICIPATED BY ZETENA

### A.    Zetena's strain reliever does not include a cable exit trough

The Zetena reference does not teach or show a cable exit *trough*, and the Board's finding to this effect is supported by substantial evidence.  Zetena discloses a strain reliever 54 which is shown in Figures 7 and 8.  A797, A802.



Zetena describes strain reliever 54 at column 4, lines 12–27:

> FIGS. 7 and 8 show a structure by means of which fiber optic cables 3 can enter and leave the raceway. Strain reliever 54 has an attaching lip 55 extending laterally which can be used, in conjunction with locking clips 25, to secure it to the lip 11 or 21 of channel member 5 or telescope member 15. Its upper portion forms a cable holder 56 with cable-retaining slots 57. A cable 3 is encircled with a protective grommet 58 which is held in place with tie wraps 59. Grommet 58 can be a piece of tubing slit lengthwise and of a size to fit about and hold the cable. The slots 57 are sized to receive and firmly hold grommet 58.
> When one wishes to have a cable 3 enter or leave raceway 1, he simply installs a strain reliever 54 at that place, secures a grommet about the cable, and fits the grommet into a slot 57.

31

A802.  This description and the figures provided by Zetena to describe its strain reliever are more than adequate basis for a reasonable mind to conclude that Zetena's disclosed slot formed in a flat piece of metal is not a trough, i.e., a long, narrow open receptacle."  In reaching its finding that Zetena does not disclose a cable exit trough, the Board in Decision 2 states:

> Cable exit trough
> Panduit contends that Zetena's cable holder 56 is a "cable exit trough."  We do not agree.  Cable holder 56 comprises a "slot" 57, not a "trough."  A trough has a more substantial length than the slot 57 depicted by Zetena.  Because Zetena does not describe a cable exit trough, the Examiner properly did not adopt the anticipation rejection by Zetena.

A26.  In Decision 3, the Board again refused to find a cable exit trough in Zetena's strain reliever.  A6-A7.  The slots cut into the flat flange of sheet metal at the top of the strain reliever are not troughs.  In rejecting Panduit's argument, the Board noted that the word *trough* means more than any structure that holds and routes cables.  A6.  Instead, the Board noted that "trough has a specific meaning with a defined structure," pointed to its initial claim construction (a "long, narrow, open receptacle, gutter, or channel"), and noted that the cable exit trough 100 disclosed in the '242 patent, unlike the strain reliever identified by Panduit, fits this description.  A6.  The Board reiterated that the trough 100 shown in the '242 patent is "more than just a 'slot' cut into a strain reliever as described in Zetena."  A7.

The Board's decision was entirely reasonable and based on the evidence. Zetena clearly discloses slots through a thin, flat piece of metal. Zetena's extremely short slots (no longer than the thickness of the flat flange) are different than a trough, which, as the Board has noted, is at least partially defined by its long shape. This difference is substantial evidence that supports the Board's finding that Zetena does not disclose a cable exit trough.

In a piecemeal fashion, Panduit tries to satisfy the Board's interpretation of *trough* (a long, narrow, open receptacle, gutter or channel) using Zetena. First, Panduit provides a dictionary definition for *receptacle* and asserts that the slot in Zetena defines a receptacle. Panduit Brief at 47.[9] Panduit next separately argues that Zetena's device is "long and narrow" because Panduit claims the device has the same relative length to width proportions as the device shown in FIG. 1 of the '242 patent. Panduit's Brief at 48. Panduit ignores the fact that in the Board's definition for *trough*, the terms *long* and *narrow* modify *receptacle*. The obvious flaw with Panduit's reasoning is that Panduit is not restricting its measurements to that portion of Zetena, i.e., the slot, that even arguably equates to a receptacle. It is the receptacle that should be long and narrow according to the Board. Zetena's slot (which Panduit says is a receptacle) is not long. There is more than enough

---

[9] This dictionary definition was not submitted during reexamination, was not considered by the Examiner or the Board and is improper.

33

evidence in Figure 8 of Zetena to support a finding that the slots in the strain reliever are not long enough to be considered a trough.

By insisting that the entire length of the strain reliever should be considered (i.e., and not just the length of the slot), Panduit is avoiding the Board's construction of *trough* without explicitly stating so. Panduit is pretending that the Board construed *trough* to mean: "an open receptacle that is merely part of a device and that device is long and narrow." That, however, is not the Board's construction. The correct question under the Board's construction is *not* how long the strain reliever is. The question is whether it includes a long and narrow receptacle. Looking to other features of the strain reliever that do not define a receptacle is irrelevant. Panduit's analysis is akin to measuring the length of a car to determine whether the car's cup holder is a long and narrow receptacle. This is flawed logic and should be rejected.

Panduit, in an attempt to show that Zetena discloses structure having sidewalls with sufficient length to be considered a trough, alternatively points to the grommet which surrounds a cable that is held in a slot 57 on the strain reliever 54. Panduit Brief at 49-50. According to Panduit, the grommet "constitutes a structural and operational component of the slot 57," and the inner side walls of the grommet provide the substantial length required for the slot to be considered a trough. *Id*. There is no evidence for Panduit's assertion that the grommet is a

34

structural and operational component of the slot. Moreover, the grommet does not guide or route the cable. It is fastened directly around an individual cable and does not route the cable at all; it goes wherever the cable goes. It merely acts as a thickened jacket for the cable to resist damage. Further, even if it was proper to consider the combination of the slot and the grommet, that combination would still not be a trough because the grommet completely surrounds the cable whereas one of the features of a trough is that it is "open."

The differences between a trough and Zetena's slot through a thin sheet of metal provide ample evidence to support a finding that Zetena's strain reliever does not include a cable exit trough. For this reason, the Board's decision not to reject claims 26-28, 31 and 32, all of which recite a cable exit *trough*, should be affirmed.

### B. Panduit's arguments regarding the "upper portion" are moot

Panduit also argues that the Board erred in finding that the Zetena reference failed to disclose the upper portion recited in independent claim 26. Panduit Brief at p. 30-41. Panduit suggests that the proper construction of the term *upper* "only requires something to be relatively above something else—not entirely above." Panduit Brief at 32. Although it is not clear what Panduit's lately offered construction means by the phrase "relatively above," the parties are in agreement at least that the recited upper portion does not need to be entirely above something

35

else, as the Board's latest decision suggests.  Ultimately, however, the issue is moot in light of section A above.  The Board's finding that Zetena does not include a cable exit trough is dispositive.

### III.
### THE BOARD DID NOT ERR IN REFUSING TO REJECT CLAIMS 6-8, 11-16, 18, 26-28 and 31-35 AS ANTICIPATED BY LONG

This Court should affirm the finding that Long does not anticipate these claims.  First, as found by the Examiner and the Board, Long does not disclose a cable exit *trough* which is recited in each of these claims.  Not only is there substantial evidence that Long does not disclose a cable exit trough, but this Court in a related appeal has already reviewed and decided this very issue.  Second, as found by the Examiner and the Board, Long does not disclose an *upper surface* that *defines a top boundary of a cable path* as further recited in claims 13-16, 18 and 33-34.  Despite this finding by the Examiner and the Board, Panduit's principal brief fails to address this missing claim element.

### A.     Long does not disclose an exit trough

The Long reference does not teach or show a cable exit *trough*, and the Board's finding to this effect is supported by substantial evidence.  In Decision 1, the Board made the following findings of fact:

> Long discloses the following:
> FF19.  Long describes a device for protecting cables which attaches to the cable ducts of switching cabinets and other cabinets or chassis housing electrical components.

FF20. "The guide means includes a rounded guide element [6 in Figure 2] which can be formed in one piece with the cable duct and extends outward from the exit opening along a curve towards a radius larger than or equal to the minimum bending radius of the cable." (Col. 1, ll. 29-33.) A portion of Figure 2 is reproduced below:



Figure 2 shows funnel shaped part 5 and rounded guide element 6. FF21. "The guide means also includes a funnel shaped part [5 in Figure 2] which is insertable into the exit opening of the cable duct. … A flare end of the funnel extends outwardly and the rounded guiding element follows the direction of the flare end." (Col. 1, ll. 33-42.)

A77-A78. In contrast to a trough which the Board construed to be a long, narrow, *open* receptacle, the Board noted that the funnel shaped part described in Long would be understood to be an enclosed tube or shaft. Because such a funnel shaped part does not have an open side, the Board determined that Long's disclosure did not include a cable exit trough, stating:

> The Examiner did not err in failing to adopt the [Long 102] rejection. As argued by ADC, Long does not describe a cable exit trough. As discussed above in the Claim Interpretation Section, a trough is a long, narrow open receptacle. Long's guide means 5 (FF20 & FF21) – the structure that corresponds to the cable exit trough of the claims – is a "funnel shaped part," which would be understood to be an enclosed tube or shaft. There is no evidence in

37

the record that Long's guide means is open at one side, as required by
the claims. Panduit's own drawings of Long's guide means show it as
completely enclosed (Panduit App. Br. 24; Fig. B). As an open
receptacle is required by all the claims in the rejection, and such a
structure is not described in Long, we affirm the Examiner's decision
not to reject [the claims] as anticipated by Long.

A78-A79.

The distinction between a trough (having an open side along its length) and a

completely enclosed tube or tunnel (such as shown in Long) is significant. A fiber

routing system may hold hundreds of fibers which may be more than a hundred

feet in length. To route one of these fibers through an enclosed tube or tunnel

requires an installer to take one of the ends of the fiber and thread, or fish, the

entire fiber through the tube. Since exit troughs are positioned along routing

systems suspended from the ceilings, this would require the installer to feed the

entire fiber while standing on a ladder. In contrast, with a trough an installer can

route a fiber within the trough by simply placing the intermediate portion of the

fiber into the trough without disturbing or needing any access to the ends of the

fiber.

Panduit raises several complaints about the Board's decision not to reject the

claims as anticipated by Long. First, Panduit attacks the Board's claim

construction for the term *trough*. Panduit asserts that the term *trough* should not be

construed as a "long, narrow, open receptacle." Instead, Panduit invites this Court

to construe cable exit trough as any "structure that routes cables out of a lateral

38

trough section by providing a pathway for the cables to exit the lateral trough section." Panduit Brief at 52.

As discussed above in section I, the Board's claim construction was not in error. Panduit is merely trying to erase the term *trough* from the claim. The term *trough* is understood to be a receptacle of a certain shape or configuration which the Board characterized as "long, narrow, open receptacle, channel or gutter." Not all structures that define pathways are troughs. A sidewalk is not a trough, even though it defines a pathway. For the reasons discussed in section I above, Panduit's claim construction should be rejected.

Panduit next asserts that there is not substantial evidence to support the finding that, under the Board's construction, Long fails to disclose a trough. The Board refused to find that Long disclosed a trough because the funnel-shaped part 5 in Long would be understood to be "an enclosed tube or shaft." An enclosed tube or shaft does not have an open side. Since a trough as construed by the Board must have an open side, Long's funnel shaped part, which the Board found to be an enclosed tube, is not a trough.

The only argument in Panduit's brief that attempts to address this analysis[10] is found on page 56 of its brief. There, Panduit suggests that even if the funnel

---

[10] Panduit begins this discussion with the specious argument that the Board had no support for a "guide means 5" in Long. Panduit Brief at 54-55. However, both the Board and the Long reference expressly identify that the funnel shaped part 5 is

shaped part 5 is a tube, it still has open ends, meaning the bottom of the tube where the cables enter the tube is open and the top of the tube where the cables exit is also open. This argument is missing the point of the Board's decision. If the cables are routed through the funnel shaped part, of course the tube that it defines has an opening at each of its ends. The Board did not misunderstand what a tube is. The openings at the ends of the tube (i.e., of the funnel shaped part) are irrelevant to the Board's analysis. A tube is not a trough because it does not have an open *side*, i.e., in the direction of its length. That is the unmistakable basis for the Board's decision, and Panduit's objection that a tube still has openings at its ends does not address the Board's findings or analysis.

Panduit further asserts that the combination of Long's funnel shaped part 5 and rounded guiding element 6 when considered together in combination, satisfies the Board's construction of a trough. On the contrary, a reasonable person could easily find (and could *only* find) that looking at these two elements in combination does not disclose a trough. The rounded guiding element 6 is a single convexly

---

part of Long's "guide means." *See, e.g.*, the Board's Finding of Fact 21 ("The guide means also includes a funnel shaped part (5 in Figure 2) which is insertable into the exit opening of the cable duct.")(A78); Long specification at col. 1:30-34 ("The guide means includes a rounded guide element . . . . The guide means also includes a funnel shaped part. . . ")(A793). Long identifies the funnel shaped part with reference numeral five. Because the funnel shaped part is included as part of the guide means, the Board's reference to "guide means 5" does not create any fatal uncertainty about the basis for the Board's analysis at A78, especially where in the very same sentence the Board identifies the "funnel shaped part" by name.

curved surface, which does not define a trough. If a tube or tunnel (the configuration of the funnel-shaped part 5 as found by the Board) is not a trough, and a sidewalk (i.e., a single surface such as rounded guiding element 6) is not a trough, then placing the two end to end, i.e., placing a sidewalk at the end of a tunnel, does not define a trough either. Neither discloses a trough individually, and neither provides what the other is lacking to create a trough. The rounded guiding element 6 does not make the funnel shaped part 5 have an open side. In other words, the tube is still an enclosed tube. Likewise, that the rounded guiding element is placed at the end of the funnel shaped part does not turn the rounded guiding element into a receptacle at all, and certainly not a long, narrow, open receptacle, channel or gutter. Neither of the two either alone or in combination defines a long, narrow open receptacle. A reasonable person could accept this conclusion based on Figure 2 of Long and its written description.

Finally, it should be noted that the Federal Circuit has already affirmed a Board decision in reexamaintion that Long does not disclose a cable exit trough. In the recent inter partes reexamination of U.S. Patent No. 6,868,220 ("the '220 patent") which is related to the present '242 patent, Panduit also argued that the claims were anticipated by Long. The Board refused to adopt Panduit's proposed rejection on the sole basis that Long did not disclose a "cable exit trough" which was an element recited in each of the '220 claims. The Board, in its Decision

41

regarding the '220 patent, interpreted the word *trough* in the same way it did in its

decision at issue in the present appeal, i.e., a long, narrow, open receptacle, gutter

or channel.  *See* A3008-A3009 ('220 Board Decision at pp. 8-9).  The Board found

that this element was missing in Long because Long disclosed an enclosed tube or

shaft, which is not a open receptacle.  A3027-A3028, A3031 ('220 Board Decision

at pp. 27-28, 31).  Panduit appealed the Board's decision regarding the '220 patent

to this Court.  *See* Appeal Nos. 2012-1435, -1436.  That appeal included extensive

briefing from each of the Parties regarding whether Long discloses a "cable exit

trough."  On August 12, 2013, this Court issued a decision summarily affirming

the Board's decision regarding the '220 patent.  A3048-A3049.

Not only is there substantial evidence that Long does not disclose a cable

exit trough, but this Court has already reviewed and decided this very issue.

**B.    Long does not disclose an upper surface that "defines a top boundary of at least a portion of a cable path" as recited in claims 13-18 and 35, or that "defines an upper surface of a cable path" as recited in claims 33-34**

**1.    Panduit did not challenge the Board's finding that Long lacks this feature**

Following the Board's June 22, 2011 Decision (Decision 1), ADC reopened

prosecution to address the new grounds of rejection that the Board had made.[11]

---

[11] Regarding independent claim 13, the Board's June 22, 2011 Decision newly
rejected this claim under 35 U.S.C. § 102 based on German Patent No. DE 37 42

ADC amended claim 13 (and thus all of dependent claims 14-18 and 35) to further recite that the cable exit trough includes "an upper surface" that "curves upward relative to the base of the lateral trough section and defines a top boundary of at least a portion of a cable path, the upper surface being curved to maintain a minimum bend radius." A233. Dependent claims 33-34 (which depend from claim 26) were added in that amendment, and similarly recite an "upper surface that curves upward relative to a base of the lateral trough section and defines an upper surface of a cable path . . . ." A236. The upper surface language in these claims requires that the exit trough must have a surface that is the top boundary (or upper surface) of a cable path such that it is positioned over cables that are routed through the cable exit trough. Such structure can be seen, for example, in FIG. 1 of the '242 patent. A104. Upper surface 126 curves upwardly and defines the top boundary (or upper surface) of the lead-in pathway 130 of the exit device. *See also* A121 (col. 3:35-46).

---

448 (Scheuermann) and under 35 based on U.S.C. § 102 based on U.S. Patent No. 6,044,194 (Meyerhoefer).

43



cable pathway 130 with upper
surface 126 that curves

A104, A108.

Panduit's response in reopened prosecution did not dispute that amended

claim 13 was patentable over the Board's new grounds of rejection. Instead,

Panduit argued *inter alia* that amended claim 13 is invalid under 35 U.S.C. § 103

based on the combination of Zetena and Long. A209. Curiously, Panduit also

argued that amended claim 13 was anticipated based on Long even though the

Board had already found in its earlier decision that claim 13 (before it was further

narrowed to include the "upper surface" limitation during reopened prosecution)

was patentable over Long.[12] A215. Panduit made the same proposed rejections for

new dependent claims 33 and 34.

---

[12] As explained above, the Board had previously found in its June 22, 2011
Decision that Long does not anticipate claim 13 because Long lacks a "cable exit
trough". A78-A79. As such, the Examiner and the Board found (in its
subsequently issued Decision) that Panduit's reassertion of this proposed rejection

44

The Examiner refused to adopt Panduit's proposed rejections of amended claim 13 (and dependent claims 14-18 and 35) based on the combination of Zetena and Long. The stated reason for the Examiner's decision, set forth below, is that none of the references (including Long) discloses an upper surface as defined in claim 13:

> The cited prior art patents and printed publications, including Zetena Jr., Long and Scheuermann et al., fail to teach a cable exit trough system, as defined in claim 13 (as well as claims 14-18 and 35 that depend from claim 13), that comprises a cable exit trough with an upper surface that curves upward relative to the base of the lateral trough section and defines a top boundary of at least a portion of a cable path.

A196.

In response to the Examiner's decision, each of the parties submitted a brief that specifically addressed the issue of whether Long (or Zetena) discloses the recited upper surface. Panduit's brief relied on a diagram constructed by Panduit to argue that the combination of references discloses an upper surface. The only reference in the diagram to structure that allegedly satisfies the recited upper surface is the drawing on the bottom right of the diagram, shown below. A176. Panduit includes a lead line from a box with the recited "upper surface" claim

---

during reopened prosecution was improper. A196-197; A35-38. Given that the Board had already decided this issue the Board did not address Panduit's re-argument of the Long §102 rejection during reopened prosecution. The Board, however, did re-address this proposed rejection in Decision 3 responding to Panduit's request for rehearing.

45

language to the bottom surface of the drawn structure.  As such, Panduit was

asserting that the bottom surface of a cable path corresponds to the recited "upper

surface" that "defines a top boundary of a cable path."



Panduit's argument to the Board during reopened prosecution identified the "upper surface" as shown in this figure and textbox created by Panduit.  A176.

"upper surface curves upward relative to the base of the lateral trough section and defines a top boundary of at least a portion of a cable path"

A176.  ADC's response brief asserted that neither Zetena nor Long discloses an

upper surface, and specifically stated that there is no surface in the Long reference

that forms the top boundary of a cable path.  A164.

The Board's June 8, 2012 Decision (Decision 2) affirmed the Examiner's

decision.  The Board found (as discussed in the section above) that a cable exit

trough is not taught by the combination of Long and Zetena.  A34.  Significantly,

the Board also found that the combination of Zetena and Long do not disclose the

recited upper surface.  A33-34.  With reference to the diagram that Panduit

provided in its brief (shown above), the Board explained that what Panduit had

pointed to as being the upper surface was in fact just a part of the bottom surface of

the device.  A34.  According to the Board, it was not reasonable to interpret the

46

separately-recited upper surface (which defines a top boundary of a cable path) to be the bottom surface. *Id*.

Despite the fact that the Examiner and the Board specifically found that Long lacks an "upper surface" that "defines a top boundary of a cable path" as recited in claim 13, Panduit's appeal brief to this Court is completely silent on this claim limitation. There is no discussion whatsoever in Panduit's brief about this limitation. Panduit's brief fails to challenge or fault the Board's finding that Long lacks the recited "upper surface". Instead, Panduit focuses exclusively on whether Long discloses a "cable exit trough." Because Panduit has not challenged the Board finding regarding the "upper surface" limitation, this Court should affirm, on this basis alone, the Board's decision refusing to adopt Panduit's proposed rejection that Long anticipates claims 13-18 and 33-35.

### 2. The Examiner and the Board correctly found that Long does not disclose an upper surface as defined in the claims.

Aside from Panduit's failure to address this issue, Long plainly lacks the defined upper surface. Figure 2 in Long is the only drawing depicting the invention, and is shown below:



FIG.2

A792.  This figure alone certainly does not show an upper surface that "curves

upward relative to the base of the lateral trough section and defines a top boundary

of at least a portion of a cable path."  The only curved surfaces that are shown are

the curved tops of the duct sidewalls (referred to in the specification as rounded

guiding element 6) and the outer sides of the funnel-shaped part 5 which contact

the inside surface of the duct 2.  Similarly, those are the only curved surfaces that

are described in the Long specification.  Neither of these curved surfaces

constitutes an upper surface that defines a top boundary of a cable path.  At best,

these surfaces form the side or the bottom of a cable path.  There is no depiction or

discussion anywhere in Long of an upper surface that curves upwardly and forms a

top boundary of a cable path.

During reexamination, Panduit's attorneys prepared drawings, which were

nowhere shown in Long, but that Panduit alleged could be inferred from the

48

disclosure in Long.  Panduit relied on these drawings in various briefs to the Board
and to the Examiner to attempt to show that Long discloses features of the '242
claimed invention.  Panduit has not referenced these drawings in its lead brief to
this Court.  However, even if had done so, there is no evidence that the attorney-
prepared drawings properly depict the structure taught in Long.  And, in fact, the
Board rejected these drawings as "merely speculative" and found that there was
"insufficient evidence that such drawings depict a structure necessarily described
by Long."  A14.  This rejection of Panduit's attorney-prepared drawings is not
even challenged by Panduit in its appeal to this Court.

After failing to convince the Board that the combination of Zetena and Long
included an upper surface, Panduit requested a rehearing.  In its rehearing request,
Panduit argued that drawings submitted by ADC interpreting Long's disclosure
constituted admitted prior art and that those drawings included all of the recited
claim elements, including the recited upper surface.  The Board, in its February 27,
2013 Decision on Rehearing, rejected Panduit's new argument for multiple
reasons.  A15-A16.  First, the Board found that the drawings submitted by ADC
were not admitted to be prior art.  *Id.*  ADC's drawings had been submitted as a
possible interpretation consistent with Long's disclosure that contradicted
Panduit's own proposed interpretation of Long.  A16.  Second, the Board
determined that, just like Panduit's proposed drawings, there was insufficient

evidence to establish that ADC's drawings were prior art.  *Id*.  The Board

concluded that both ADC's and Panduit's interpretations of Long were merely

speculative and unsupported by evidence.  A16; A14.  Finally, the Board found

that even if ADC's drawings were considered prior art, they still do not show a

cable exit trough as required by all the claims.  A16.  The Board's findings on each

of these points are based on substantial evidence.  Long shows only one figure, and

does not include either Panduit's drawings or ADC's drawings.  Panduit has not

even challenged these findings in this appeal.

## <u>CONCLUSION</u>

The Board's Decision should be affirmed.  The Board did not err in construing the term *trough,* and substantial evidence supports the Board's decisions not to reject the claims as anticipated by Zetena and not to reject the claims as anticipated by Long.


Respectfully Submitted,

Dated:  October 24, 2013              /s/Philip P. Caspers
                                                     Philip P. Caspers
                                                     Timothy A. Lindquist
                                                     Samuel A. Hamer
                                                     Joseph W. Winkels
                                                     CARLSON CASPERS VANDENBURGH
                                                     LINDQUIST & SCHUMAN, P.A
                                                     225 South Sixth Street, Suite 4200
                                                     Minneapolis, Minnesota  55402
                                                     Phone: (612) 436-9600
                                                     Fax: (612) 436-9605
                                                     pcaspers@carlsoncaspers.com

                                                     *Attorneys for Appellee*
                                                     ADC Telecommunications, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 24, 2013, a true and correct copy of the

foregoing document was served by ECF upon the following counsel of record:

John W. O'Meara
jomeara@oliff.com

James Oliff
joliff@oliff.com

Jesse O. Collier
jcollier@oliff.com

/s/ Philip P. Caspers
Philip P. Caspers

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(7)(C), Fed. R. App. P., I certify that this brief

complies with the type-volume limitation of Rule 32(a)(7)(B), Fed. R. App. P.

This brief contains 11,192 words, calculated by the word processing system used

in its preparation.

Dated:      October 24, 2013

/s/ Philip P. Caspers
Philip P. Caspers